IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 18, 2004

## STATE OF TENNESSEE v. GARY LEE JOHNSON

**Appeal from the Circuit Court for Giles County**
**No. 10647     Jim T. Hamilton, Judge**

---

**No. M2003-02060-CCA-R3-CD - Filed November 16, 2004**

---

Following a jury trial, the defendant, Gary Lee Johnson, was convicted of aggravated assault, assault,[1] and resisting arrest.  He was sentenced as a Range I, standard offender to six years in the Department of Correction for the aggravated assault and eleven months, twenty-nine days for each of  the assault and resisting arrest convictions.  All sentences were to be served concurrently.  He appeals only the aggravated assault conviction, arguing that the evidence is insufficient to support the conviction.  After review, we affirm the convictions but remand for entry of corrected judgments in Counts 1 and 2.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and**
**Remanded for Entry of Corrected Judgments**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JAMES CURWOOD WITT, JR., JJ., joined.

Claudia S. Jack, District Public Defender, and R. H. Stovall, Jr., Assistant Public Defender, for the appellant, Gary Lee Johnson.

---

[1]The jury convicted the defendant of reckless aggravated assault of his father in Count 1 and aggravated assault of Deputy Chris Alsup in Count 2.  Apparently, the trial court reduced one of the aggravated assault convictions to assault as evidenced by one of the judgments entered in this matter.  However, because the count numbers are missing from the judgments, we are unable to determine whether the reckless aggravated assault conviction in Count 1 or the aggravated assault conviction in Count 2 was reduced.  The cover page of the technical record, as well as its index, reflects that it was the aggravated assault conviction in Count 2 that was reduced to assault.  However, the trial court's order denying the defendant's motion for a new trial stated the issue presented as whether the "proof offered by the State [was] sufficient to justify a finding of guilty of aggravated assault on Deputy Chris Alsup," without referring to a count number of the indictment.  In their briefs, both parties have treated the reckless aggravated assault conviction in Count 1 as the conviction that was reduced to assault.  Thus, we will proceed on the assumption that the defendant is appealing his conviction for aggravated assault as to Deputy Alsup.

Paul G. Summers, Attorney General and Reporter; Richard H. Dunavant, Assistant Attorney General; T. Michael Bottoms, District Attorney General; and Patrick S. Butler, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Bob Lee Johnson, the defendant's father, testified that on June 20, 2002, at approximately 4:00 p.m., he was sitting in a chair outside his residence, watering his garden, when the intoxicated defendant showed up and physically attacked him. The victim, who was seventy-four years of age at the time of the attack, explained that the defendant "jumped on me. He tackled me, more or less." He said the defendant "just come up and just got me around the neck and screamed at me" and threw him to the ground, destroying the victim's glasses. After this initial attack, the victim managed to get back into his chair, but was again attacked by the defendant. During the second attack, the defendant grabbed the victim around the head and forced his thumbs into the victim's mouth, stretching his lips far enough apart to cause bleeding. The victim said the defendant also hit him with his fist and slapped him. The victim sustained bruising to his face and arms and identified photographs depicting his injuries. After the defendant left, the victim went inside his house and called 9-1-1.

Deputy Chris Alsup, of the Giles County Sheriff's Department, testified that on June 20, 2002, he and Sergeant Tommy Chapman responded to a domestic disturbance at the victim's residence. Alsup described the victim as having "quite a bit of blood on his clothing. He appeared to be gasping for air, as if he was struggling in receiving air. He was shaken up. He was teary-eyed." The deputy believed the blood on the victim's clothing came from the "numerous cuts, bruises, lacerations about his arms and his face and his neck." He said that when he looked into the victim's mouth "on each side of his jaw area, we noticed just -- It's hard to describe. It was obvious black and blue bruises. There were streaks of blood on each side of his jaws." Asked what the victim told them, Deputy Alsup said the victim's statement was consistent with his testimony in court.

After photographing the victim's injuries, Alsup learned that the defendant could be located at his residence, which was approximately three to five miles from the victim's house. He and Sergeant Chapman went to the defendant's residence to arrest him for aggravated assault on the victim. Upon their arrival, they proceeded to the home of the defendant's relatives which was located about twenty to twenty-five yards from the defendant's mobile home. Alsup said that due to the information he "had gathered – . . ., the defendant, being intoxicated, the injuries that I had seen that he had done to his father, his own relative, caused me concern, caused me to want to place a phone call in an attempt to get him to come outside instead of me just knocking on the door." Alsup had the defendant's female relative call the defendant from a cordless phone while they were all outside. The witness testified that "[d]uring the time that we were in front of his residence, the -- it's a mobile home – the mobile home door come flying open, hits the side of the trailer. [The defendant] comes out with a long gun rifle." Alsup said the defendant held the gun in a "stern manner. It was a manner in which I felt he was letting us know this was his territory." He said the

defendant held the gun as "being what they [the military] call a port arms. It's not necessarily close to the body. It was out, what I took, in an aggressive manner, 'aggressive' meaning that [the defendant] could very well do something to me or the people in which the company I was with." The deputy acknowledged that the defendant did not point the gun at anyone. After seeing the gun, Alsup and Chapman took cover behind a vehicle; and the defendant went back inside his home, refusing to come out. The officers then radioed for backup, and Sheriff Eddie Bass and other officers arrived on the scene. Sheriff Bass telephoned the defendant numerous times, urging him to come out. After about four hours, Bass "inserted a plastic tube into the air conditioning vent and released pepper spray into the residence." Shortly thereafter, the defendant, who appeared to be intoxicated, came outside.

On cross-examination, Deputy Alsup acknowledged that the defendant was unarmed when he came out and that the officers did not have their blue lights activated or do anything, other than have his relative telephone him, to announce their presence to the defendant. The deputy also acknowledged that he did not listen to the conversation between the defendant and the relative, but overhead the relative refer to the person with whom she was talking as "Gary." Alsup said that, when the defendant came out of his mobile home with the gun, he was "shaking it" and cursing at them. Asked how the defendant looked when he saw the officers, Alsup initially testified, "I'm not really sure how he looked. I think he was as surprised as we was [sic] to see him." He later clarified that he was "not sure of the surprise effect" and that possibly the defendant was surprised "that we were still there after he had told us to leave." The deputy said the entire incident of the defendant's being outside his mobile home, holding his gun, lasted "[a]bout five to seven seconds, maybe." However, he said he had been threatened by the defendant's having a gun and by the "cuss words that came out of [the defendant's] mouth."

Sergeant Tommy Chapman, of the Giles County Sheriff's Department, testified that he was with Deputy Alsup at the victim's home on June 20, 2002. The victim had told them he had been in a fight with his son, the defendant. Chapman described the victim's mouth as "bruised on the inside, and it was like somebody had pulled him or something. . . . Like a blood blister is what the inside of his mouth looked like." The sergeant said he and Deputy Alsup knew where the defendant lived and went to his residence to arrest him for assaulting the victim. They "parked a ways down the driveway so maybe we wouldn't drive right up where he could see the cars" and then walked down the driveway and talked to the female relative who lived next door, asking her to call the defendant. Chapman said he "took up a position close to a tree because I didn't know if [the defendant] would be armed or what." The defendant then "came out of the door. The door opened toward us and the door slammed back, and he came out and looked up at her [the relative] and he looked at us. And he had that gun, and he looked at us. He had it kind of like port arms, and I hollered at him to drop the gun, and at that time I had my gun." The sergeant said that the defendant cursed and yelled at the officers, "If you want me, you got to come and get me" and then ran back inside his house. The officers notified Giles County Sheriff Eddie Bass of the situation, and he subsequently arrived on the scene. After approximately four hours, pepper spray was injected into the defendant's house in an effort to get him to come outside. As Chapman approached the door of the house, the defendant told him to get away from the door or the defendant would "blow [him]

away from the door." Shortly thereafter, the defendant "fell" out the door after being overtaken by the pepper spray. Chapman acknowledged that the defendant did not have his gun with him when he came out of the house.

Sheriff Eddie Bass testified that he responded to a "man barricaded with a gun" radio call at the defendant's residence. He talked to the defendant by cellular telephone, attempting to get him to come out of his mobile home, for such a lengthy time that the battery on his telephone went dead. Sheriff Bass described the defendant as "pretty well intoxicated." At one point, Sheriff Bass and Sergeant Chapman attempted to open the defendant's front door but were threatened away when the defendant said "[s]omething to the effect of 'Get away from the door or I'll blow the door off the hinges or shoot through the door.' Which he knew we were in front of the door." After a four-hour stand-off, Sheriff Bass injected pepper spray into the seal around the defendant's window air conditioner. A short time later, the unarmed defendant came out and was arrested. Sheriff Bass retrieved the defendant's loaded gun from inside the mobile home, identifying it as a Harrington and Richardson ten gauge, single shot shotgun. He also identified the shell recovered from the gun as a three-inch magnum, double ought buckshot.

The defendant did not present any evidence at trial.

## ANALYSIS

### Sufficiency of the Evidence

The defendant argues the evidence is insufficient to support his conviction for aggravated assault on Deputy Alsup because, by his view, the State failed to show that he intentionally or knowingly placed the officer in fear of imminent bodily injury. Specifically, he asserts that the State failed to prove that he knew the officers were outside when he walked out the front door of his house, holding his firearm in a "port arms" position.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed.2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt.") All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002), our supreme court restated the holding of State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993), which in turn quoted State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985), that "[a] conviction may be based entirely on circumstantial evidence where the facts are 'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'"

We now will determine whether the evidence in this case is sufficient to support the defendant's conviction for aggravated assault. Aggravated assault is defined in Tennessee Code Annotated section 39-13-102, which provides:

> (a) A person commits aggravated assault who:
>
> (1) Intentionally or knowingly commits an assault as defined in § 39-13-101 and:
>
>> (A) Causes seriously bodily injury to another; or
>>
>> (B) Uses or displays a deadly weapon; or
>
> (2) Recklessly commits an assault as defined in § 39-13-101(a)(1), and
>
>> (A) Causes seriously bodily injury to another; or
>>
>> (B) Uses or displays a deadly weapon.

Tenn. Code Ann. § 39-13-102(a). Aggravated assault under section 39-13-102(a)(1) consists of three elements: (1) mens rea, (2) commission of an assault as defined under section 39-13-101; and (3) either (a) serious bodily injury or (b) use or display of a deadly weapon. State v. Hammonds, 30

S.W.3d 294, 298 (Tenn. 2000). The second element requires the commission of an assault as defined under section 39-13-101, which provides that a person commits assault who:

> (1) Intentionally, knowingly, or recklessly causes bodily injury to another;
>
> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
>
> (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Id. (quoting Tenn. Code Ann. § 39-13-101(a)).

The defendant's argument is that, because neither officer did anything to announce his presence upon arrival at the defendant's residence, "there is no proof that the [defendant] knew there were two deputies in the yard when he stepped onto his porch holding the gun in the 'port arms' position." The defendant argues that due to this lack of evidence, the State failed to prove he intentionally or knowingly put Deputy Alsup in imminent fear of bodily injury. The defendant relies on State v. Wilson, 924 S.W.2d 648 (Tenn. 1996), to support his claim. In Wilson, the defendant was convicted of aggravated assault after firing shots into a house. Our supreme court reversed the conviction after determining that the defendant neither knowingly nor intentionally placed the occupants in the house in fear of imminent bodily injury because the evidence failed to prove the defendant knew anyone was in the house at the time of the shooting. Id. at 651.

However, a careful review of the evidence shows that the defendant did know the officers were present when he stepped out onto his porch with his firearm. Testimony of the officers demonstrated that he threatened both as soon as he stepped outside. Describing the event, Deputy Alsup testified on cross-examination as follows:

> Q.    Did [the defendant] ever holler anything at you or say anything to you from this distance, while he was on the front porch with a shotgun in the port arms position?
>
> A.    Yes, sir.
>
> Q.    What did he say?
>
> A.    I don't know verbatim. There was cursing. But, like I said, at the same time he was hollering out something to the effect of "Come get me," several cuss words came out of his mouth. Of course

we was [sic] retreating for cover. We did not -- I did not document exactly what he said because of our retreating.

Sergeant Chapman's testimony on direct examination described the encounter in a similar fashion:

> Q. You pulled your gun?
>
> A. Yes, sir, and I ordered him to drop the weapon.
>
> Q. What did he do?
>
> A. He yelled, and I'm not for sure everything he said. But I know he said "If you want me, you got to come and get me," and he run back in the house. And he was shutting the door, and the gun barrel was hung. It was sticking out the door because it's so long. And he shut the door, and he had to jerk on the gun to get it back in the house.
>
> Q. He said "If you want me, you've got to come and get me"?
>
> A. Yes, sir.
>
> Q. Was he cursing or anything during this?
>
> A. Yes, sir. I believe he had a lot of cussing during the whole ordeal. We could hear him from inside the house. . . .

We conclude this evidence is more than sufficient for a reasonable jury to find that the defendant had committed the offense.

We note that although the judgment for the aggravated assault of Deputy Alsup correctly states the charge and conviction class as a Class C felony, it erroneously lists the Tennessee Code Annotated section as 39-2-101. The correct section for aggravated assault is 39-13-102. Therefore, we remand for entry of a corrected judgment to reflect the correct statute. Additionally, the judgments in Counts 1 and 2 should be corrected to reflect which count of the indictment each represents.

**CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court and remand for entry of corrected judgments in Counts 1 and 2.

-7-

_____
ALAN E. GLENN, JUDGE